ANDREA T. MARTINEZ, United States Attorney (#9313)
CY H. CASTLE, Assistant United States Attorney (#4808)
MARK E. WOOLF, Assistant United States Attorney (WA Bar #39399)
Attorneys for the United States of America
111 South Main Street, Ste. 1800 | Salt Lake City, Utah 84111
Tel: (801) 524-5682 | Fax: (801) 325-3399 mark.woolf@usdoj.gov |
cy.castle@usdoj.gov

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>vs.<br><br>$42,047.17 Seized from Bank of America Account Ending in 6905;<br><br>Defendant *in Rem*. | Case No. 2:22-CV-00142-TS<br><br><br>**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***<br><br><br>Judge Ted Stewart |

Pursuant to Supplemental Rule G(2) of the Federal Rules of Civil Procedure, the United States of America states the following *in rem* action for forfeiture.

## **NATURE OF THE ACTION**

1.      This is a judicial forfeiture action under 18 U.S.C. §§ 981(a)(l)(C) and 981(a)(1)(A), seeking forfeiture of the Defendant Property more particularly described at Paragraph 9 herein.

2.      The Defendant Property is subject to forfeiture under 18 U.S.C. §

981(a)(l)(C), which provides that "any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in [18 U.S.C. §] 1956(c)(7))" is forfeitable to the United States. Section 1956(c)(7) further defines "specified unlawful activity" to include "any act or activity constituting an offense listed in [18 U.S.C. §] 1961(1)". *See* 18 U.S.C. § 1956(c)(7)(A).

3.      Any offense under 18 U.S.C. § 1341 (relating to mail fraud) or 18 U.S.C. § 1343 (relating to wire fraud) constitutes a "specified unlawful activity." *See* 18 U.S.C. § 1961(1). Any offense under 18 U.S.C. § 1347 (relating to health care fraud) constitutes a "specified unlawful activity" since violation of this statute is a "Federal health care offense" as defined in 18 U.S.C. § 24. *See* 18 U.S.C. § 1956(c)(7)(F). Because the Defendant Property was involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1341, 1343, and 1347 it is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

4.      The Defendant Property is further forfeitable pursuant to 18 U.S.C. § 981(a)(1)(A), which provides that "any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 [or] 1957…or any property traceable to such property," is subject to forfeiture to the United States. Because the Defendant Property was "involved in" or "traceable to" a transaction or

2

attempted transaction that violated 18 U.S.C. §§ 1956 and 1957, it is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1345 because this is a civil action commenced by the United States. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1355(a) because this is an "action or proceeding for . . . forfeiture[.]"

6.     This Court has *in rem* jurisdiction pursuant to 28 U.S.C. § 1355(b) and (d).

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1355(b)(1)(A) because the "acts or omissions giving rise to the forfeiture" occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1395 because (1) the forfeiture accrued in this district, and (2) the Defendant Property may be found in this district.

## PARTIES

8.     Plaintiff is the United States of America.

9.     Defendant *in rem* (referred to as "Defendant Property" throughout this Verified Complaint) is more particularly described as $42,047.17 and is currently on deposit in a Bank of America account ending in 6905 ("Target Account"). The Target Account is in the name of Mr. Shannon Michael Betz doing business as Core

3

Fulfillment Service, Inc. ("Core Fulfillment Service").

10.    The Target Account is currently in the custody and control of Bank of America pursuant to a hold request by the Federal Bureau of Investigations ("FBI") made on September 9, 2021.

## FACTS SUPPORTING FORFEITURE

### Global Medical Therapeutics, Inc

11.    Global Medical Therapeutics, Inc. ("GMT") is a Utah based pharmacy owned by Maysam Mortazavi ("Mortazavi").

12.    On August 8, 2018, GMT received licenses to operate as both a Class A and Class B pharmacy.[1] Under its Class B license, GMT is required to provide "pharmaceutical administration and sterile production preparation facilities." Utah Code Ann. § 58-17b-102(11)(b)(ii).

*A. GMT's Introduction to DME*

13.    Mortazavi learned of a group who partnered with individuals and entities that held a Provider Transaction Access Number ("PTAN"), a Medicare number issued to providers upon enrollment in Medicare that is required to submit

---

[1] A Class A license allows GMT to operate in Utah as "a retail pharmacy to compound or dispense a drug or dispense a device to the public under a prescription order." *See* Utah Code Ann. § 58-17b-102(10). Class B pharmacies include institutional pharmacies that provides services to a target population unique to the needs of the healthcare services required by the patient. *See* Utah Code Ann. § 58-17b-102(11).

Medicare claims and receive reimbursement, and heard the group could help Mortazavi increase his profits. Mortazavi and his business partner, Sirtaj Singh ("Singh") decided to learn more about the business proposition.

14.     Mortazavi traveled to California and met Richard Harris ("Harris") and Chet A. Teklinski ("Teklinski") at their business office located in San Diego, CA. During their meeting, Harris and Teklinski told Mortazavi they were involved in the distribution of durable medical equipment ("DME") and explained how GMT's PTAN could be used to facilitate the billing of DME.

15.     DME is "[e]quipment and supplies ordered by a health care provider for everyday or extended use." Durable Medical Equipment (DME), HealthCare.gov (Feb. 9, 2022), https://www.healthcare.gov/glossary/ durable-medical-quipment-dme/. Examples of DME include oxygen equipment, wheelchairs, crutches, knee braces, or blood testing strips for diabetics.

16.     During the meeting, Harris and Teklinski also introduced Mortazavi to Mary Fleming ("Fleming") and Camille Thudium ("Thudium"), who operated Medical Service Resources, Inc. ("Medical Service Resources"), which was involved in the billing and fulfillment aspects of the DME business. As explained later below, Medical Service Resources was part of a scheme to defraud those paying for the DME devices, including Medicare.

17.    Mortazavi subsequently entered into service agreements and HIPAA Business Associate Contracts with the various parties he met to participate in the DME business. Under the agreements, GMT permitted Medical Service Resources to bill Medicare and other providers using GMT's PTAN. In exchange for the use of GMT's PTAN for billing, Mortazavi and Singh received anywhere between 8-10% of the collections. Later the amount was increased to 11%.

18.    Harris and Teklinski "retired" soon after Mortazavi met them, but Mortazavi continued to interact with Fleming and Thudium.

B. Physical Inspection of GMT

19.    In October 2020, the Division of Occupational and Professional Licensing conducted a routine pharmacy inspection of GMT. The inspection discovered the designated Class B pharmacy space, which adjoined GMT's retail pharmacy, contained only various pieces of gym equipment and a large filing cabinet. The inspector described the Class B pharmacy space as "non-functional."

20.    The inspector noted GMT only filled about five prescriptions a day. When asked how he remained in business with such a low number of filled prescriptions, Mortazavi explained he had a side business where he sold DME products and that the side business supplemented his retail pharmacy.

21.    The inspector asked to see the vendor invoices for the DME products

GMT sold over the last year. Mortazavi provided a Payment Register, which identified the patients, the DME codes representing equipment prescribed, and the cost of each piece of DME equipment. Mortazavi explained he had a warehouse in San Diego, CA where he maintained the DME.

22.     As part of her inspection, the inspector looked through documents in the filing cabinet located in the same room as the gym equipment. The inspector noticed the filing cabinet contained an assortment of invoices and letters from insurance companies addressed to GMT.

*C. NE UPIC's Investigation into GMT*

23.     The FBI received an investigative referral from a representative of Northeastern Unified Program Integrity Contractor (NE UPIC) for Medicare.

24.     On August 6 through August 20, 2019, NE UPIC investigated GMT. The investigator conducted four beneficiary interviews and determined that in each case the DME braces received by the beneficiaries were (1) unsolicited, (2) did not have a basis for medical necessity, and (3) were prescribed by physicians who did not have a relationship with the beneficiary.

25.     Based on a proactive data analysis, the NE UPIC alleged GMT billed both for medically unnecessary DME supplies and for services not rendered. According to the referral, GMT identified referring providers who had no prior

relationships with 100% of the beneficiaries for whom GMT billed DME supplies.

26.     As a result of the investigation, the NE UPIC determined, "[t]his DME supplier appears to have similar billing practices as others involved in the national orthotics scheme, billing for medically unnecessary back, shoulder, knee and wrist braces."

*D. DME Complaints Received by GMT*

27.     George Loercher ("Loercher") is a licensed pharmacist previously employed by GMT.

28.     Sometime in 2020, Loercher started receiving phone calls at GMT from patients or relatives of patients claiming they received DME they had not ordered. In some instances, the patient, or the patient's relative, told Loercher they contacted the doctor whose signature approved on the prescription order only to find the doctor claimed to know nothing of the order. Loercher received telephone calls related to DME approximately two or three times per week, either from a patient or an insurance company.

29.     Insurance providers generally requested the medical records reflecting the doctor's signature that prescribed the DME. Loercher was unaware of any medical records stored at GMT. Loercher asked Mortazavi about the DME telephone calls and Mortazavi told him to write down the name of the patient, their date of

8

birth, and insurance and Mortazavi would pass the information on to his company in San Diego, California to take care of it. Loercher stated that Mortazavi told him that the people in San Diego were his employees who were responsible for sending DME all around the country.

30.     Loercher noticed insurance providers sent GMT letters related to the billing of DME, but Loercher couldn't recall seeing any DME physically present at GMT to be sold. Loercher believed the letters were placed in a file folder and kept on-site.

31.     Hassan Sharifzadeh ("Sharifzadeh"), worked at GMT as Mortazavi's administrative assistant from approximately January 2020 until GMT's closing in March 2021.

32.     Sharifzadeh acknowledged GMT received correspondence from Medicare and other insurance companies related to DME almost every day. The insurance mailings mostly contained explanations of benefits or checks, but occasionally insurance companies would send written requests for refunds resulting from overpayments. Some of the insurance correspondence stated the patient who received the DME did not want or need the orthotic device received.

33.     Occasionally, GMT received mailings with requests for large amounts of patient records. Mortazavi directed Sharifzadeh to send these requests to Fleming

and Thudium in California and explained Fleming and Thudium were both involved in Mortazavi's DME business in California.

34.     Sharifzadeh received documents from Medicare indicating they were reviewing previously submitted claims. Sharifzadeh also reviewed a letter regarding the denial of an appeal made by GMT for a DME related Medicare claim. Sharifzadeh showed these letters to Mortazavi, but Mortazavi never explained the denials.

35.     Sharifzadeh also began receiving telephone calls from insurance companies. Many of these calls asked for refunds, noting in some instances the patients who received DME equipment did not want or need the equipment. Mortazavi instructed Sharifzadeh to send this information to Fleming and Thudium.

*E. GMT's National Provider Identification Number*

36.     Medical providers are assigned a number as a National Provider Identifier ("NPI"). The purpose of the NPI is to uniquely identify a health care provider in standard transactions, such as health care claims.

37.     A review of GMT's NPI showed that between January 1, 2018, to December 21, 2020, Medicare received 2807 claims for DME related equipment from GMT. GMT billed Medicare $4,154,898.70 and received $2,132,868.36.

**Execution of Federal Warrant**

38.    On March 1, 2021, the FBI executed a federal search warrant on GMT.

39.    Agents discovered client service agreements and HIPAA Business Associate Contracts that showed agreements between Mortazavi, doing business as GMT, and the following individuals and business entities:

- Richard Harris, dba Advanced Rehabilitation Technologies, Inc.

- Mary Fleming, President, Medical Resource Specialists, Inc.

- Chet A. Teklinski, President, Medical Equipment Device Specialists

40.    Among the documents, agents found a client service agreement dated August 16, 2018, between GMT and Medical Resource Specialists.

41.    Under the agreement, Medical Resource Specialists agreed to (1) bill patient charges to insurance comgpanies as received by fax from provider to Medical Resource Specialists, (2) review patient statements and mail as needed, (3) provide management reports to the provider on a monthly or weekly basis, as needed, (4) follow-up on delinquent accounts with patients and/or insurance companies on accounts delinquent over 30 days, and (5) provide the provider with insurance verification and pre-authorization as requested.

42.    Included in the Agreement was a "fee payment" condition that entitled GMT to 8% of the collection amount.

**Core Fulfillment Services, Inc.**

43.     GMT and Medical Resource Specialists utilized Shannon Betz ("Betz"), doing business as Core Medical, Inc. ("Core Medical") and Core Fulfillment Services, for the fulfillment and distribution of DME products to beneficiaries.

**Tracing Criminal Proceeds to Defendant Property**

44.     GMT maintained two bank accounts at JP Morgan Chase Bank ("Chase Bank"); one ending in 6166, opened on December 29, 2014, and the other ending in 3539, opened on November 19, 2019.

45.     Mortazavi operated as the sole signer on the Chase Bank account ending in 3539. The Chase Bank account ending in 6166 operated with multiple signatories, including Mortazavi, Singh, Teklinski, and Fleming.

46.     Agents conducted a forensic financial review of GMT's two accounts, which revealed the two accounts received a combined total of $3,208,569.59 from the date account 6166 was open until September 30, 2020. Of the total, GMT received $2,042,982.65 from Medicare deposits, which compromised 63.7% of the deposited funds. GMT received the remaining $1,165,586.94 from Medicare Advantage plan insurance programs and other non-Medicare government insurance programs (i.e., Tricare) and private insurance companies.

47.    GMT made disbursements from its two bank accounts to various medical companies associated with the DME scheme, including disbursements to Core Fulfillment Services.

48.    Between October 16, 2019, to July 9, 2021, GMT deposited $292,010.83 into the Target Account held by Core Fulfillment Services, with the last deposit made on January 12, 2021. The deposits from GMT accounts accounted for 33.9% of the deposits into the Target Account for the timeframe.

49.    By depositing into the Target Account under the guise of paying dues owed under service agreements, GMT commingled the proceeds of the fraudulent billing for DME with other funds from Core Fulfillment Services with the intent to facilitate the scheme through disguising, obscuring, and/or concealing the source of the tainted funds.

50.    On July 9, 2021, the Target Account had a balance of $42,047.17, the amount of the Defendant Property.

## FIRST CLAIM FOR RELIEF
18 U.S.C. § 981(a)(l)(C)
(Mail Fraud)

51.    The United States incorporates paragraphs 1-50 as though fully set forth herein.

52.    Under 18 U.S.C. § 981(a)(l)(C) "any property, real or personal, which

13

constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in [18 U.S.C. §] 1956(c)(7)" is forfeitable to the United States.

53.     Specified unlawful activity" is defined at 18 U.S.C. § 1956(c)(7), *inter alia*, as "any act or activity constituting an offense listed in [18 U.S.C. §] 1961(1)." *See* 18 U.S.C. § 1956(c)(7)(A). Mail fraud in violation of 18 U.S.C. § 1341 is a listed offense under section 1961(1) and, therefore, a specified unlawful activity for purposes of forfeiture under 18 U.S.C. § 981(a)(1)(C).

54.     Specifically, 18 U.S.C. § 1341 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money…by means of false or fraudulent pretenses, representations, or promises…for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed shall be guilty of a crime.

55.     GMT and Medical Resource Services devised or intended to devise a scheme or artifice to defraud by obtaining money through claims made to Medicare and private insurance providers made under false or fraudulent pretenses and

knowingly used, or knowingly caused someone to use, the United States Post Office, or other private interstate carrier, to deliver fraudulent claims to Medicare and other private insurance providers, in violation of 18 U.S.C. §§ 1341, and 2.

56.     Core Fulfillment Services also participated in the scheme to obtain insurance payouts by fulfilling the fraudulent claims made by GMT through Medical Resource Services and knowingly sending physical DME product to beneficiaries through private and public carriers. GMT paid Core Fulfillment Services for the fulfillment services provided, with the payments deposited to the Target Account. Thus, the Defendant Property is traceable to the mail fraud offense in violation to 18 U.S.C. §§ 1341 and 2.

57.     Therefore, the Defendant Property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) as property constituting, or derived from, proceeds of violations of section 1341.

## SECOND CLAIM FOR RELIEF
18 U.S.C. § 981(a)(l)(C)
(Wire Fraud Forfeiture)

58.     The United States incorporates paragraphs 1-57 as though fully set forth herein.

59.     Under 18 U.S.C. § 981(a)(l)(C) "any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting

15

'specified unlawful activity' (as defined in [18 U.S.C. §] 1956(c)(7)" is forfeitable to the United States.

60.     "Specified unlawful activity" is defined at 18 U.S.C. § 1956(c)(7), *inter alia*, as "any act or activity constituting an offense listed in [18 U.S.C. §] 1961(1)." *See* 18 U.S.C. § 1956(c)(7)(A). Wire fraud in violation of 18 U.S.C. § 1343 is a listed offense under section 1961(1) and, therefore, a specified unlawful activity for purposes of forfeiture under 18 U.S.C. § 981(a)(1)(C).

61.     Specifically, 18 U.S.C. § 1343 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice shall be guilty of a crime.

62.     GMT and Core Fulfillment Services participated in a scheme to cause Medicare and private insurance companies to authorize the payment of DME for beneficiaries who had no need for DME using wire communications to transfer funds from Medicare and private insurance companies to GMT's business accounts, in violation of 18 U.S.C. § 1343.

63.     Therefore, the Defendant Property is subject to forfeiture under 18

U.S.C. § 981(a)(1)(C) as property constituting, or derived from, proceeds of a violation of section 1343.

## THIRD CLAIM FOR RELIEF
18 U.S.C. § 981(a)(l)(C)
(Health Care Fraud)

64.    The United States incorporates paragraphs 1-63 as though fully set forth herein.

65.    Under 18 U.S.C. § 981(a)(l)(C) "any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in [18 U.S.C. §] 1956(c)(7)" is forfeitable to the United States.

66.    "Specified unlawful activity" is defined at 18 U.S.C. § 1956(c)(7), *inter alia*, as "any act or activity constituting an offense involving a Federal health care offense." *See* 18 U.S.C. § 1956(c)(7)(F). Health care fraud in violation of 18 U.S.C. § 1347 is a "Federal health care offense" as defined by 18 U.S.C. § 24 and, therefore, a specified unlawful activity for purposes of forfeiture under 18 U.S.C. § 981(a)(1)(C).

67.    Specifically, 18 U.S.C. § 1347 provides:

Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice to defraud any health care benefit program; or to obtain by means of false or

17

fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be guilty of a crime.

68.   GMT, Medical Resource Specialists, and Core Fulfillment Services executed or intended to execute a scheme or artifice to defraud Medicare and other private insurance providers by billing and delivering unneeded DME to beneficiaries, paid for by health care benefits in violation of 18 U.S.C. §§ 1347 and 2.

69.   Therefore, the Defendant Property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) as property constituting, or derived from, proceeds of a violation of section 1347.

### FOURTH CLAIM FOR RELIEF
18 U.S.C. § 981(a)(l)(A)
(Money Laundering)

70.   The United States incorporates paragraphs 1-69 as though fully set forth herein.

71.   Under 18 U.S.C. § 981(a)(l)(A) "any property, real or personal, involved in a transaction or attempted transaction in violation of section…1956…or any property traceable to such property" is forfeitable to the United States.

72.   Specifically, 18 U.S.C. § 1956(a)(1)(A)(i) prohibits, *inter alia*, any

entity or individual "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity," from conducting or attempting to conduct "such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity."

73.     Section 1956(c)(4) defines the term "financial transaction" to mean "a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or…a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree."

74.     GMT paid a total of at least $292,010.83 to Core Fulfillment Specialists to promote the distribution of fraudulent DME, knowing the payments were derived of proceeds generated from a "specified unlawful activity," namely violations of 18 U.S.C. §§ 1341, 1343, and 1347, in violation of section 1956.

75.     Furthermore, the payments by GMT to Core Fulfillment Services were made with the intent to facilitate the scheme by deliberately disguising, conceling, and/or obscuring the illegitimate source of the disbursements by commingling tainted funds with potentially untainted funds. Consequently, the entirety of the Defendant Property in the Target Account, whether tainted or untainted, is subject

to forfeiture.

76.     Therefore, the Defendant Property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(A) as property "involved in" or "traceable to" a violation of section 1956.

### FIFTH CLAIM FOR RELIEF
### 18 U.S.C. § 981(a)(l)(A)
### (Money Laundering)

77.     The United States incorporates paragraphs 1-76 as though fully set forth herein.

78.     Under 18 U.S.C. § 981(a)(l)(A) "any property, real or personal, involved in a transaction or attempted transaction in violation of section…1957…or any property traceable to such property" is forfeitable to the United States.

79.     Specifically, 18 U.S.C. § 1957 prohibits any entity or individual from "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity."

80.     Section 1957(f) defines the term "monetary transaction" to mean "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument… by, through, or to a financial institution…"

81.     GMT knowingly paid Core Fulfillment Services a total of $292,010.83 which constituted proceeds gained from a "specified unlawful activity." Seven of the payments GMT made to Core Fulfillment Services had values greater than $10,000, illustrated by the table below.

| Date Paid | Check # | Amount | Transaction Type |
|-----------|---------|--------|------------------|
| 12/3/2019 | | $11,386.25 | Wire |
| 12/10/2019 | | $15,827.34 | Wire |
| 12/31/2019 | | $15,576.43 | Wire |
| 01/09/2020 | 1002 | $20,701.53 | Check |
| 01/13/2020 | | $12,432.70 | Wire |
| 02/14/2020 | 1034 | $10,082.96 | Check |
| 02/20/2020 | 1038 | $13,178.50 | Check |
| | **TOTAL** | **$99,185.71** | |

82.     GMT knowingly engaged in monetary transactions with criminally derived property that were proceeds of a "specified unlawful activity" of a value greater than $10,000, in violation of section 1957.

83.     Therefore, the Defendant Property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(A) as property "involved in" or "traceable to" a violation of

section 1957.

84.    The monetary transactions with criminally derived proceeds were made with the intent to facilitate the overall scheme by deliberately disguising, conceling, and/or obscuring the illegitimate source of the disbursements by commingling tainted funds with potentially untainted funds. Consequently, the entirety of the Defendant Property in the Target Account, whether tainted or untainted, is subject to forfeiture.

## **REQUEST FOR RELIEF**

WHEREFORE, the United States respectfully asserts there is reasonable cause to believe the Defendant Property identified herein is forfeitable to the United States under 18 U.S.C. §§ 981(a)(1)(C) and 981(a)(1)(A). Accordingly, the United States respectfully requests:

A. That notice of this action be given to all persons known or thought to have an interest in or right against the property;

B. That the Defendant Property be forfeited and condemned to the United States of America;

C. That the Court decree, confirm, enforce, and enter an Order of Forfeiture as to the Defendant Property to the United States of America; and thus, order the Federal Bureau of Investigation or other applicable federal

agency, or their delegates, to dispose of the Defendant Property as provided by law; and

D. That the Court award the United States all other relief to which it is entitled, including the costs of this action and for such other and further relief as this Court deems just and proper.

Dated this 1st day of March, 2022.

ANDREA T. MARTINEZ
United States Attorney

*/s/ Mark E. Woolf*
MARK E. WOOLF
Assistant United States Attorneys

23

## VERIFICATION

I am a Special Agent with the Federal Bureau of Investigation, and declare under penalty of perjury, as provided by 28 U.S.C. § 1746, that I have read the foregoing Verified Complaint for Civil Forfeiture *In Rem*, and that the facts contained therein are based upon my personal knowledge or upon information I obtained in the course of my investigation and are true and correct to the best of my knowledge and belief.

Executed on this __1st__ day of March, 2022.

Lindsay M. Garland
FBI Special Agent